**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|                                    |   |                              |
|------------------------------------|---|------------------------------|
| UNITED STATES OF AMERICA,          | ) |                              |
|                                    | ) | Criminal No. 10-10226-PBS    |
| v.                                 | ) |                              |
|                                    | ) |                              |
| BAUDILO MERCADO,                   | ) |                              |
|         Defendant.                 | ) |                              |

**Memorandum and Order**

August 30, 2011

**Saris, U.S.D.J.**

**I. Introduction**

Defendant Buadilio Mercado moves to suppress all evidence, statements and information obtained as a result of a stop and search of both his person and the motor vehicle he was driving on April 30, 2010. After an evidentiary hearing taking place over the course of two days, on June 10 and 23, 2011, the motion to suppress is **DENIED**.

**II. Facts**

On, April 30, 2010, at 6:25 pm, Massachusetts State Trooper Jeremy Sweeney was on duty in his marked cruiser, and entering the rotary at the intersection of Route 110 and Interstate 93 in Methuen, MA, when he noticed a silver Cadillac Deville traveling within a hash-marked area on the interior of the rotary. Trooper

1

Sweeney activated his cruiser's emergency blue lights and pulled over the vehicle. The vehicle stopped just as it was beginning to merge onto Interstate 93 heading South.

After pulling the vehicle over, Trooper Sweeney approached it on the passenger side and observed two occupants sitting in the front seat of the car. Trooper Sweeney then asked the driver for his license, and the vehicle registration, and also asked for the passenger's identification. The driver, Mercado, told Trooper Sweeney that his license had been suspended and provided Trooper Sweeney with his Massachusetts identification card. The passenger of the vehicle, Kathline Culbert, handed Trooper Sweeney her New Hampshire driver's license and the vehicle's registration. The vehicle was registered in New Hampshire under Culbert's name, and Mercado was not a registered owner of the vehicle. Culbert and Mercado were dating and lived together in Manchester, New Hampshire. (Tr. Day 1, 116).

Trooper Sweeney returned to his cruiser to run the information he had been given by the occupants of the vehicle. Based on his encounter with the vehicle's occupants, Trooper Sweeney was concerned that there may be some other type of illegal activity taking place and consequently called Trooper Edward Troy to respond as back-up. While Trooper Sweeney was running the information on the vehicle's occupants, Trooper Troy arrived on the scene and took a position standing at Trooper

2

Sweeney's driver's window so he could both watch the stopped vehicle and communicate with Trooper Sweeney.

Upon checking Defendant's records, Trooper Sweeney learned that Defendant's license had been suspended and further learned that Defendant had an extensive criminal record. While Trooper Sweeney was checking Mercado's information, Trooper Troy apparently observed Culbert lean back and to the left while sitting in the front seat of the vehicle, which lead Trooper Troy to believe that Culbert may have hidden something in her pants. (Tr. Day 1, 17:1-2.)

After checking the records in his cruiser, Trooper Sweeney returned to the vehicle's driver side and asked Mercado to exit the vehicle. Trooper Troy accompanied Trooper Sweeney and went to the passenger side of the vehicle to speak with Culbert. Once out of the vehicle, Trooper Sweeney asked Mercado if he had any weapons on his person. Mercado told the Trooper that he did not and then voluntarily turned around and put his hands on the trunk of the vehicle, in the prone position, without being asked by Officer Sweeney to do so. (Tr. Day 1, 18:21-22.) Trooper Sweeney then conducted a pat-frisk of Mercado and found a double-sided folding knife in Mercado's front pocket. Next, Trooper Sweeney asked Mercado where he was coming from, to which Mercado replied that they were coming from his house in Lawrence. Trooper Sweeney then asked where Mercado and his girlfriend were going,

to which Mercado replied that his girlfriend had not had her period in over a month, that her stomach was bothering her and that they were on their way to Lawrence General Hospital. Next Trooper Sweeney asked if there was anything in the vehicle that should not be there, and Mercado answered that there was not and further stated, "You can check it if you want to." (Tr. Day 1, 41:6-8.)

While Trooper Sweeney was speaking with Mercado, Trooper Troy was speaking with Culbert, who was still seated in the passenger side of the vehicle. Culbert informed Trooper Troy that she and Mercado were driving to Chelsea, Massachusetts, to visit Culbert's mother and that she had cramps, but when asked by the Trooper if she needed an ambulance, Culbert replied that she did not and that she had her period and was fine. Trooper Sweeney and Trooper Troy compared the inconsistent stories they were given by Mercado and Culbert respectively, and then Trooper Sweeney went to speak with Culbert, who was still seated in the vehicle, while Trooper Troy stood with Mercado at the back of the vehicle. Trooper Sweeney asked Culbert if there was anything in the vehicle that should not be there. Culbert appeared nervous at Trooper Sweeney's question and apparently looked down and to the left before stating that she did not think there was anything in the vehicle. Based on his interactions with Culbert and Mercado, Trooper Sweeney felt there was likely contraband in the vehicle.

4

Trooper Sweeney asked Culbert if he could search the vehicle and she replied: "I guess so."[1] (Trial Tr. Day 1, 91:25.)

Trooper Sweeney asked Culbert to exit the vehicle and sit on the hood of the vehicle. Trooper Sweeney then began his search of the passenger compartment of the vehicle. Approximately fifteen minutes had elapsed from the time of the stop to the beginning of Trooper Sweeney's search of the vehicle. While Trooper Sweeney was engaged in his search, Culbert came to the side of the vehicle on two separate occasions to ask Trooper Sweeney if she could smoke a cigarette.

While Trooper Sweeney was searching the passenger compartment, Trooper Troy received a call regarding another accident. Trooper Troy was forced to leave the scene and Methuen police were contacted to send assistance to the scene. Trooper Sweeney paused his search and shortly thereafter, two Methuen police officers, Captain Haggar and Officer Torrisi arrived on scene. After the Methuen police arrived, Trooper Troy left for the other accident.

Officer Torrisi informed Trooper Sweeney that he had a narcotics detection dog and asked the Trooper if he wanted the Officer to run the dog around the Cadillac. Trooper Sweeney

---

[1] Ms. Culbert submitted an affidavit stating she did not give consent to search her car. (Culbert Aff., ¶ 6.) While she was sitting in the courtroom during the hearing, she asserted her Fifth Amendment privilege and declined to testify. I do not give great weight to the affidavit.

5

agreed, and the K-9 officer then ran his narcotics detection dog around the exterior of the vehicle. The dog alerted to the passenger side door and the trunk of the vehicle. The dog was then let into the vehicle and alerted to the center console of the vehicle. Upon checking the center console, the officers found marijuana seeds, marijuana stems and pieces of marijuana bud in the center console area.

Next, Trooper Sweeney and the Methuen police officers went to the trunk of the vehicle and opened it. Upon opening the trunk the officers observed a plastic firearm case. Captain Hagger opened the firearm case and found a HiPoint 9mm pistol. The officers also observed a fully-loaded 8-round ammunition clip in plain view in the cargo netting in the trunk.

Trooper Sweeney placed Mercado under arrest for driving without a license, and informed Mercado of his Miranda rights. Trooper Sweeney then asked Mercado if he knew anything about the gun in the car, to which Defendant stated that he did not. Trooper Sweeney asked Culbert for her license to carry firearms in Massachusetts to which she responded that she did not have one. Trooper Sweeney then placed Culbert under arrest for possession of a firearm without a license, and informed her of her Miranda rights. Both the Defendant and Culbert were transported to the State Police barracks in Andover, Massachusetts. At the barracks, Culbert admitted that she had

hidden a plastic bag with 15 rounds of .380 caliber ammunition in her pants during the traffic stop.

Either on the way to the State Police barracks or shortly after arriving, Trooper Troy contacted Special Agent John Mercer from the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives, and informed him of Mercado's arrest. Special Agent Mercer agreed to come to the barracks to investigate possible federal firearms crimes. Prior to being interviewed, Mercado was again provided with his Miranda rights and signed a written waiver of his Miranda rights. Mercado was interviewed by Troopers Sweeney and Troy and Agent Mercer in an interview room at the Andover State Police barracks. During the interview, the troopers informed Mercado that because of his criminal history, if he were charged with possession of a firearm he would be facing potentially significant incarceration, including a potential 15-year mandatory minimum sentence. But Mercado was told that if he cooperated the ATF would look "favorably on his proceedings." (Tr. Day 1, 50:24-25.) He was also informed that any cooperation he gave would be brought to the attention of either the Assistant United States Attorney or the Assistant District Attorney. (Tr. Day 1, 51:7.)

Defendant was asked during the interview if he wanted to cooperate with law enforcement, to which Mercado responded that he did wish to cooperate. During his taped interview, Mercado

7

indicated that he had handled the firearm that day, after it had been purchased. Based on his offer to cooperate with law enforcement, Mercado was released that day to begin his cooperation. Mercado subsequently did not provide any substantial cooperation (in the government's view), and was charged with a federal firearms offense and arrested.

### III. Discussion

Mercado argues that all evidence and statements obtained as a result of the stop and search of his person and vehicle should be suppressed because (1) the officers' search of his vehicle was unreasonable, and (2) his post arrest statements were coerced.

Although the government argues that Mercado does not have standing to assert his Fourth Amendment rights over the vehicle he was driving, the Court need not address this question because it finds that even if Mercado had "standing", he consented to the search. There is First Circuit precedent that could be interpreted to require district courts to address the question of Fourth Amendment "standing" before moving on to examine whether the search at issue was reasonable. See United States v. Bouffard, 917 F.2d 673, 677 (1st Cir. 1990) (remanding to district court for further fact-finding on question of whether the defendant had legitimate expectation of privacy in the vehicle he was driving as opposed to addressing other issues raised on appeal, even though the government had conceded the

standing question before the district court).  Nonetheless, in line with clear precedent from its sister circuits, the First Circuit has avoided deciding whether a defendant has "standing" to make a Fourth Amendment argument when a district court's decision not to suppress evidence is supported on other grounds. See, e.g., United States v. Bater, 594 F.3d 51, 55 (1st Cir. 2010) (court need not address government's claim that defendant had no standing to contest seizure since district court had properly determined that the defendant had consented to the seizure); United States v. Garcia-Villalba, 585 F.3d 1223, 1234 n. 6 (9th Cir. 2009) ("Because we believe that probable cause exists, we do not reach the government's argument that Armando lacked standing to challenge the search.  We may bypass this issue, which is not jurisdictional."); United States v. Esquivias, 416 F.3d 696, 702 (8th Cir. 2005).

**A. Consent**

I find that Mercado's statement "You can check it if you want," constituted an express invitation to police to search the entire vehicle, including its trunk.  However, Mercado argues that his consent to the search was involuntary because he was not informed that he had a right to refuse consent, and he provided consent only when surrounded by "significant police presence including [a] police dog."

A consensual search is one exception to the Fourth

9

Amendment's warrant requirement. U.S. v. Forbes, 181 F.3d 1, 5 (1st Cir. 1999). "To establish applicability of the consent exception, the government must prove valid consent by a preponderance of the evidence." Id. To be valid, consent to a search must be voluntary. Id. (citing Ohio v. Robinette, 519 U.S. 33 (1996)). "The determination of voluntariness 'turns on an assessment of the totality of the circumstances.'" Forbes, 181 F.3d at 5 (quoting United States v. Barnett, 989 F.2d 546, 554-55 (1st Cir. 1993)); see also United States v. Dunbar, 553 F.3d 48, 56-57 (1st Cir. 2009) ("'The existence of consent and the voluntariness thereof are questions of fact to be determined from all the circumstances surrounding the search.'" (quoting United States v. Winston, 444 F.3d 115, 121 (1st Cir. 2006))).

> The court should take into account factors such as the consenting party's 'age, education, experience, intelligence, and knowledge of the right to withhold consent.' Further considerations 'include whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances.'

Id. (quoting United States v. Forbes, 181 F.3d 1, 5 (1st Cir. 1999)).

Regarding the argument that Mercado was not advised of his right to refuse consent to the search, the First Circuit has "repeatedly held that the failure to advise a defendant of his right to refuse consent does not automatically render such consent invalid." United States v. Jones, 523 F.3d 31, 38 (1st

Cir. 2008) (citing U.S. v. Perez-Montanez, 202 F.3d 434, 438 (1st Cir. 2000)). Rather, the court must "take into account the totality of circumstances surrounding the interaction between the defendant and the authorities" to determine whether consent was "freely and voluntarily given." See Perez-Montanez, 202 F.3d at 438. Here, though Mercado was not advised of his right to deny consent, I find that he "appreciated the significance of giving [it]." Jones, 523 F.3d at 38. This is not a case where the police asked to search Mercado's vehicle, and he consented despite the troopers' failure to inform him he did not have to. Rather, Mercado invited the police to search his vehicle in response to their inquiries about whether it contained a weapon. As opposed to suggesting that he was coerced into giving consent, or even that he was uninformed about the possibility of denying consent, Mercado's conduct suggests familiarity with police investigations and an effort to curry favor with the police in the hopes of ultimately cooperating and gaining a plea agreement.

Mercado's argument that significant, intimidating police presence made his consent involuntary is also unavailing. For one, it does not appear that the police dog was present when Mercado consented to the search. Even if it were, however, the First Circuit has held that valid consent may be given notwithstanding significant police presence and the presence of a K-9 police dog. See Dunbar, 553 F.3d at 57 (consent valid even

though "it given only after [defendant] was removed from his car by a police officer and placed in the back of a police cruiser, with a police dog in the compartment behind him"). Further, other factors, including Mercado's age and experience with the criminal justice system, suggest that he would not have been significantly intimidated by the presence of police. Mercado was no babe in the criminal woods. As described above, he appeared conciliatory not because the troopers bent his will but because he believed based upon his experience that the easiest way to avoid a severe sentence was to cooperate with the authorities.

**B. Post-Arrest Statements**

Mercado argues that because his post-arrest statements to Agent Mercer were "based upon representations that led him to believe that he would not be prosecuted for the gun recovered in the incident and that any statements he made would not be used against him in connection with this incident," his statements were coerced and thus should be suppressed. See Shotwell Mfg. Co. v. United States, 371 U.S. 341, 347 (1963)(evidence of guilt induced by promises of immunity is coerced and inadmissible).

Like the question of whether Mercado consented to the search of the vehicle, the question of whether his statements were voluntarily given turns on an analysis of the "totality of the circumstances." See United States v. Flemmi, 225 F.3d 78, 91 (1st Cir. 2000) (citing United States v. Walton, 10 F.3d 1024, 1028

(3d Cir. 1993)). Here, Mercado's argument faces a considerable uphill battle because he was given his Miranda warnings twice before providing his statement: once orally at the scene of his arrest, and once more in writing after his arrest at the police barracks. "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry. But. . .[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." Dickerson v. United States, 530 U.S. 428, 444 (2000)(citations and internal quotation marks omitted). After receipt of Miranda warnings, a "suspect's choice whether to excercise his priveilege to remain silent should ordinarily be viewed as an act of free will." Oregon v. Elstad, 470 U.S. 298, 311 (1984)(internal citation marks and citations omitted).

The "totality of the circumstances," especially when considered alongside the fact that Mercado received his Miranda warnings, compel a conclusion that his statements were voluntarily made. It is true that in certain settings promises of immunity can be coercive. See United States v. Pinto, 671 F.Supp. 41, 57 (D. Me. 1987) (collecting cases and stating that courts rely on a "variety of factors," including the nature of the promise, the context in which it was made, the characteristics fo the individual defendant, whether the

13

defendant was informed of his rights, and whether counsel was present, to determine whether a promise of immunity renders a statement involuntary). Here, however, the police never made Mercado any express promises about what was likely to occur if he cooperated. They merely informed him of the sentence he might receive and that his cooperation would be communicated to the prosecutor and would lead law enforcement to look favorably on his case. Such communications, though likely influencing Mercado's decision to make the statements, were not improper and did not overbear his will. See United States v. Foley, 595 F.Supp. 2d 171, 178 (D. Mass. 2009) ("a promise to bring cooperation to the attention of the prosecutor or the court, without more, is not coercive as a matter of law"); United States v. Rodriquez, 606 F.Supp. 1363, 1378 (D. Mass. 1985) ("Although agents. . .gave defendant. . .a detailed description of the case against him, informed him that he would probably serve a lengthy prison sentence if he were convicted, and promised to bring his cooperation to the attention of the Court, these statements alone do not constitute coercion").

### IV. Order

The motion to suppress (Docket No. 23) is **DENIED**.

/s/ Patti B. Saris  
Patti B. Saris  
United States District Judge